

# United States Senate

WASHINGTON, DC 20510

August 3, 2017

Dr. Thomas R. Kane
Acting Director
Federal Bureau of Prisons
320 First St., NW
Washington, DC 20534

The Honorable J. Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Acting Director Kane and Deputy Attorney General Rosenstein:

We are writing to ask that you take a serious look at the Bureau of Prison's (BOP) use of compassionate release. We would also appreciate it if you would provide us data on compassionate release and an explanation of BOP's plans to increase the use of compassionate release based on the recently revised guidance issued by the U.S. Sentencing Commission (the Commission).

Congress authorized compassionate release in the *Sentencing Reform Act of 1984*. It allows federally incarcerated people to appeal for early release if they present certain "extraordinary and compelling" reasons. Upon approval of the request, BOP makes a motion to a federal judge for a sentence reduction. The Commission sets the "extraordinary and compelling" criteria, which include, but are not limited to, age and terminal illness. The program essentially allows BOP to seek the release of certain elderly and terminally ill inmates, as well as those with special family circumstances, before the end of their prison sentences rather than keep those inmates in prison when they are no longer a significant risk to the community and when they are draining away substantial and valuable BOP resources.

In a 2013 report, the Department of Justice (DOJ) Inspector General (IG) reviewed BOP's use of compassionate release and recommended reforms to the program.[1] In another report, the IG found that federal prisons house an increasingly large number of aging individuals who often have serious medical conditions, and that medical care is one of the biggest expenses of the federal prison system.[2]

---

[1] https://oig.justice.gov/reports/2013/e1306.pdf.

[2] https://oig.justice.gov/reports/2015/e1505.pdf.

**EXHIBIT A**

The IG pointed out that using compassionate release will help address rising prison spending, a serious concern, especially in our current budget environment. The elderly are the fastest growing population in federal prison, expected to represent 28% of the total population by 2019. Incarceration costs for the elderly and terminally ill in prisons are substantially greater than for the general population. In fiscal year (FY) 2015, BOP spent $1.1 billion on medical care for incarcerated people, an increase of nearly 30% in 5 years. BOP's budget request for FY 2018 represents 29.9% of DOJ's overall budget.

The appropriate use of compassionate release also should not impact public safety. People released under compassionate release have a 3.5% recidivism rate, the lowest rate among all those formerly incarcerated. Additionally, incarcerated individuals 50 years and older have a 15% re-arrest rate, compared to a 41% re-arrest rate for the general federal prison population.

After the issuance of the IG's report, BOP adopted new policies to expand its criteria for compassionate release, delineating three categories of applicants: medical, non-medical, and age-based. BOP also attempted to streamline its process for considering petitions under compassionate release.

However, as the IG report found, BOP did not have clear standards or a formal timeline standard when making its compassionate release decisions. At a 2016 hearing before the Commission, the IG related that in the 13 months since BOP's changes, "93 elderly inmates applied under the non-medical provision, resulting in 2 releases, while none of the 203 elderly inmates who applied under the medical provision had been approved for release."[3]

Due in part to the fact that the BOP brought very few motions for compassionate release, in November 2016, the Commission amended its sentencing guidelines pertaining to "extraordinary and compelling reasons."[4] The Commission, which already recognized terminal and debilitating conditions as well as exceptional family circumstances, expanded and clarified the criteria for age and family circumstances.

Importantly, the amendment directly encourages BOP to file a motion for compassionate release if the defendant meets any of the criteria set by the Commission, explaining that the sentencing court, rather than the BOP, is best suited to decide if the prisoner deserves compassionate release.[5]

We agree that under current law, it is the appropriate purview of the sentencing court to determine if a defendant's circumstances warrant a sentence reduction under compassionate release. But BOP needs to take a hard look at expanding the use of compassionate release of certain federal prisoners as a way to focus scarce BOP resources and improve public safety. In light of the recent changes the Commission made that expand compassionate release, we ask that you respond to the following questions about BOP's use of compassionate release:

---

[3] https://oig.justice.gov/testimony/t160217.pdf.
[4] http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20160428_RF.pdf.
[5] See U.SS.G. sec. 1B1.13 comment (n4).

1. In the past three years, how many compassionate release requests, categorized by criteria, have BOP wardens received? How many were forwarded with recommendations to the Central Office (also categorized by criteria)? Of those, how many were granted and how many were denied? For both categories, how long on average did petitioners wait before receiving an answer? While waiting, how many petitioners died before receiving a response to their request for compassionate release? For all requests, whether disposed of by the warden or the Central Office, and for both denials and grants, what reasons did BOP give for its decisions?
2. What steps has BOP taken to respond to the Commission's directive to expand the use of compassionate release? If BOP has made no compassionate release policy changes or has not increased the number of compassionate release motions filed in the courts since the guideline change, please explain why and how BOP intends to remedy those problems?
3. What actions can BOP take to increase the use of compassionate release? What additional actions can BOP take to reduce the number of aging and sick people in federal prisons and reduce spending on incarceration without harming public safety?

Congress gave the Commission the authority to determine the conditions by which an individual in federal prison could be released for "extraordinary and compelling reasons." It authorized federal courts to reduce a defendant's sentence if that individual meets the criteria set by the Commission. And Congress gave BOP the administrative task of filing motions in federal court if the defendant meets the Commission's criteria for compassionate release. We are deeply concerned that BOP is not fulfilling its role in the compassionate release process.

BOP should make the compassionate release process more efficient and use that authority to the full extent provided by the Commission's guidance. Thank you for your attention to this matter, and we look forward to your response.

Sincerely,

BRIAN SCHATZ
United States Senator

SHELDON WHITEHOUSE
United States Senator

JEFFREY A. MERKLEY
United States Senator

CORY A. BOOKER
United States Senator

MICHAEL S. LEE
United States Senator

ELIZABETH WARREN
United States Senator

EDWARD J. MARKEY
United States Senator

KIRSTEN GILLIBRAND
United States Senator

RICHARD J. DURBIN
United States Senator

JOHN CORNYN
United States Senator

TAMMY DUCKWORTH
United States Senator

THOM TILLIS
United States Senator

**The New York Times** | https://nyti.ms/2G2z3X1

# Frail, Old and Dying, but Their Only Way Out of Prison Is a Coffin

By Christie Thompson

March 7, 2018

Kevin Zeich had three and a half years to go on his prison sentence, but his doctors told him he had less than half that long to live. Nearly blind, battling cancer and virtually unable to eat, he requested "compassionate release," a special provision for inmates who are very sick or old.

His warden approved the request, but officials at the federal Bureau of Prisons turned him down, saying his "life expectancy is currently indeterminate."

Congress created compassionate release as a way to free certain inmates, such as the terminally ill, when it becomes "inequitable" to keep them in prison any longer. Supporters view the program as a humanitarian measure and a sensible way to reduce health care costs for ailing, elderly inmates who pose little risk to public safety. But despite urging from lawmakers of both parties, numerous advocacy groups and even the Bureau of Prisons' own watchdog, prison officials use it only sparingly.

Officials deny or delay the vast majority of requests, including that of one of the oldest federal prisoners, who was 94, according to new federal data analyzed by The Marshall Project and The New York Times. From 2013 to 2017, the Bureau of Prisons approved 6 percent of the 5,400 applications received, while 266 inmates who requested compassionate release died in custody. The bureau's denials, a review of dozens of cases shows, often override the opinions of those closest to the prisoners, like their doctors and wardens.

Advocates for the program say the bureau, which oversees 183,000 inmates, denies thousands of deserving applicants. Roughly half of those who died after applying were convicted of nonviolent fraud or drug crimes.

**EXHIBIT B**



Mr. Zeich during his time in prison. When he made the request for compassionate release, he was nearly blind, battling cancer, and virtually unable to eat.  Jenna Schoenefeld for The New York Times

"It makes sense to release prisoners who present very little danger to society. It's the humane thing to do, and it's the fiscally responsible thing to do," said Senator Brian Schatz of Hawaii, a Democrat. "The Bureau of Prisons has the theoretical authority to do this, but they basically do none of it."

Case files show that prison officials reject many prisoners' applications on the grounds that they pose a risk to public safety or that their crime was too serious to justify early release. In 2013, an inspector general reported that nearly 60 percent of inmates were denied based on the severity of their offense or criminal history. The United States Sentencing Commission has said that such considerations are better left to judges — but judges can rule on compassionate release requests only if the Bureau of Prisons approves them first.

Late last month, Mr. Schatz introduced legislation — co-sponsored with Senators Mike Lee of Utah, a Republican, and Patrick Leahy of Vermont, a Democrat — that would let prisoners petition the courts directly if the bureau denies or delays their requests.

Many are turned down for not meeting medical requirements. Mr. Zeich, who was serving 27 years for dealing methamphetamine, requested compassionate release three times, but was repeatedly told he was not sick enough. On his fourth try, his daughter, Kimberly Heraldez, finally received a phone call in March 2016 saying her father would soon be on a plane, headed to her home in California.

Early the next morning, she was awakened by another call. Her father had died.

Mr. Zeich's ashes now sit in a container in her closet alongside the splitting cardboard box of the possessions he had in prison: an insulin pump, glasses, stacks of medical records, and an album filled with photos of Ms. Heraldez and her three children.

"We brought him home," Ms. Heraldez said, "but not the way we wanted to."

## 'I Begged Them'

When Anthony Bell applied for compassionate release in October 2014, he had served all but one of a 16-year sentence for selling cocaine.

Prison doctors treating his lupus and liver failure estimated that he had less than six months to live. It took about that long for the bureau to hand down its response: Denied.

After reading Mr. Bell's medical records, officials concluded that he had more than 18 months to live. Two days later, he died.

"I begged them to please get him home," said Mr. Bell's sister, Denise Littleford, of Gaithersburg, Md. "And while the blood was still warm in his body, instead of sending him home in a body bag."

Compassionate release dates back to an overhaul of federal sentencing laws in the 1980s. While abolishing federal parole, Congress supplied a safety valve, giving judges the power to retroactively cut sentences short in "extraordinary and compelling" circumstances. But a court could do so only if the Bureau of Prisons filed a motion on an inmate's behalf.

For years, the agency approved only prisoners who were near death or completely debilitated. While nonmedical releases were permitted, an inspector general report found in 2013, not a single one was approved over a six-year period.



Mr. Zeich's last letter to his daughter, Ms. Heraldez.   Jenna Schoenefeld for The New York Times

The report said the program should be expanded beyond terminal illness cases and used more frequently as a low-risk way to reduce overcrowding and health care spending. The Bureau of Prisons widened the criteria to explicitly include inmates over 65 and those who are the sole possible caregiver for a family member. Then Attorney General Eric H. Holder Jr. promoted the changes as part of his "Smart on Crime" initiative to "use our limited resources to house those who pose the greatest threat."

But the bureau, which is part of the Justice Department, has yet to fully embrace those changes. Of those inmates who have applied for nonmedical reasons, 2 percent (50 cases) have been approved since 2013, according to an analysis of federal prison data. And although overall approval numbers increased slightly between 2013 and 2015, they have since fallen.

At a 2016 sentencing commission hearing, Bureau of Prisons officials said they believed the program should not be used to reduce overcrowding. And even the principal deputy assistant to Mr. Holder, Jonathan Wroblewski, said the program was not an "appropriate vehicle for a broad reduction" in the prison population. "Every administration has taken the position that part of our responsibility is to ensure that public safety is not undermined," he said.

After the hearing, the commission released new guidelines encouraging prison officials to determine only whether inmates fit the criteria for release — that is, if they are old enough, sick or disabled enough, or if they are the sole possible caregiver for someone on the outside. Whether the prisoner poses a risk to the public should be left to a judge to decide, the commission said.

Mark Inch, who was appointed director of the Bureau of Prisons by Attorney General Jeff Sessions last August, has made no public statements about the program. The bureau declined to make Mr. Inch available for an interview and did not respond to emailed questions.

## Dying in Shackles

The inmates who meet the criteria for compassionate release tend to be among the oldest and frailest in the federal prison system, whose population is getting older and more expensive. The Bureau of Prisons spent $1.3 billion on health care in fiscal year 2016. Roughly 12 percent of prisoners are 55 or older, and of those, many will spend their final years behind bars. Some are dying in shackles.

When Andrew Schiff arrived at a medical facility for inmates to say his goodbyes, his dying 87-year-old father was unconscious and on a respirator. Yet he was cuffed to his hospital bed and under 24-hour watch by an armed guard, according to Mr. Schiff. "There's no humanity in there," he said.



Irwin Schiff, second from left, during a prison visit from his son, Andrew, and his grandchildren, Eliza and Ethan.

His father, Irwin Schiff, had less than two years left on his sentence for tax fraud. He had tried and failed for two years to win compassionate release.

To win approval, an inmate must get the blessing of the prison warden, and must have an acceptable home waiting. Doctors at the facility assess whether the applicant meets the medical criteria, such as being completely disabled or having fewer than 18 months to live.

If the warden signs off, the application gets passed on to the Bureau of Prisons' central office, which has its own medical director review the records. Even after the central office approves, the deputy attorney general may object. If approved, the request is passed on to a judge, who makes the ultimate decision. An analysis of federal prison data shows that it takes over six months on average for an inmate to receive an answer from the bureau. Almost 400 of the applications the bureau received between 2013 and 2017 are still awaiting a decision.

## Pushing for Change

Most state prison systems have some version of compassionate release, sometimes known as medical parole. Nationally, prisons are facing an explosion in elderly inmates, but officials can still be wary of the idea of letting them out early. Recently, a Senate committee in South Dakota turned down the prison system's request to establish a similar program, citing concern over releasing violent offenders.

In recent months, both Democratic and Republican lawmakers have called on the Bureau of Prisons to speed up the federal process and grant more requests. Senator Richard Shelby of Alabama, a Republican, pressed the bureau for details on how it was improving the process in a report he submitted with the 2018 appropriations bill. A bipartisan group of senators, led by Mr. Schatz of Hawaii, wrote a letter last August saying they were "deeply concerned" that the bureau was failing to carry out its duties under the program.

The Justice Department's Office of Legislative Affairs issued a response in January, citing approval rates that were slightly higher than those reflected in the data provided by the Bureau of Prisons to The Marshall Project and The New York Times. The bureau did not explain this discrepancy.

The January letter stated that cases were most commonly denied because inmates did not meet the criteria or lacked a stable place to live if they were released. But in 2016, officials turned down one of the oldest federal prisoners, 94-year-old Carlos Tapia-Ponce, on the grounds that his crime, a role in a large-scale cocaine trafficking operation, was too serious. He died the following month.

Tommy Leftwich died in prison last September. He had been serving 12 years for making meth when he was diagnosed with advanced liver cancer. The bureau said in October 2016 that his early release would "minimize the severity of his offense and pose a risk to the community," noting a history of drug offenses and impaired driving.

Wayne "Akbar" Pray, 69, who has served nearly 30 years of a life sentence for running a New Jersey cocaine operation in the 1980s, first applied for compassionate release under the elderly inmate provision in 2013. His supporters included his warden, the current and former mayors of Newark, the local N.A.A.C.P., and several former members of Newark law enforcement.

In January, the bureau denied his request, pointing to the severity of his crime and his conduct in prison.

According to his disciplinary history, Mr. Pray's last violation was 20 years ago, for "improperly storing property and failure to follow sanitation procedures."

Anna Flagg contributed reporting.

Christie Thompson is a staff writer and Anna Flagg is an interactive reporter for The Marshall Project, a nonprofit news organization that focuses on criminal justice issues.

A version of this article appears in print on March 8, 2018, Section A, Page 13 of the New York edition with the headline: Feeble, Little Time to Live, and Still Stuck Behind Bars

# United States District Court

### DISTRICT OF NEVADA
### PROBATION OFFICE

**Chad R. Boardman**
CHIEF PROBATION OFFICER



☒ Reply to Las Vegas

Foley Federal Building
300 Las Vegas Blvd. South
Suite 1200
Las Vegas, NV 89101
Tel: 702-527-7300
Fax:702-527-7345

☐ Reply to Reno

Bruce R. Thompson U.S. Courthouse
400 S. Virginia St.
Suite 103
Reno, NV 89501
Tel: 775-686-5980
Fax: 775-686-5990

August 16, 2017

Warden
Federal Correction Institution
37900 North 45th Avenue
Phoenix, Arizona 85086-7008

Attn: B. Swank
      Case Manager

RE: Levine, Robert M
Register Number: 96074-012

## PRERELEASE INVESTIGATION

Dear Case Manager Swank:

After conducting our investigation, it appears that the proposed residence is suitable for supervision if Levine is released from custody.

Contact was made with Levine's sister-in-law, Toby Stoffa, and her husband, Thomas J. Moore, at the proposed release residence,                Las Vegas, Nevada. Ms. Stoffa and Mr. Moore confirmed the offender's release plan, and they are willing to assist Levine by allowing him to reside with them. Ms. Stoffa and Ms. Moore indicated that there are firearms within their residence; however, they are willing to remove the firearms prior to Levine's release from the Federal Bureau of Prisons. Criminal record checks on all the occupants revealed no outstanding warrants.

Levine was sentenced to a term of Life imprisonment, with no term of supervised release. It is recommended that the United States District Court for the Northern District of Indiana impose a term of supervise release, along with all the mandatory and standard conditions of supervision. Additionally, based on the instate offense, it is felt that the following special conditions are necessary:

    **Mental Health Treatment** – You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

*-Integrity is Our Guide-*

**EXHIBIT C**

**Access to Financial Information** – You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office will share financial information with the U.S. Attorney's Office.

**Debt Obligations** – You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer

**No Contact** – You must not communicate, or otherwise interact, with Mark L. Levine, either directly, indirectly, or through someone else.

**Search and Seizure** – You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

Should you have any questions or need further assistance, please feel free to contact the undersigned officer at (702) 527-7322.

Sincerely,

Leonel Sanchez-Hernandez
2017.08.16 11:37:57 -07'00'

Leonel Sanchez
United States Probation Officer

Approved:

Robert G. Aquino
2017.08.16 15:03:15 -07'00'

Robert G. Aquino
Supervisory United States Probation Officer

EXHIBIT 2



U. Department of Justice
**FEDERAL BUREAU OF PRISONS**
**Federal Correctional Institution**
**Phoenix, Arizona**

---

P.O. Box 37900 N. 45th Ave
Phoenix, AZ 85086

September 8, 2017

MEMORANDUM FOR:    KEN HYLE, ACTING ASSISTANT DIRECTOR,
OFFICE OF GENERAL COUNSEL

FROM:    M. Gutierrez, Acting Warden

SUBJECT:    Request for Compassionate Release/Reduction in Sentence
LEVINE, Robert M.
Reg. No.: 96074-012
Docket No. HCR 91-00003-001

Our staff recommend consideration be given to modify the imposed term of confinement for Robert M. Levine, under Title 18, United States Code 3582 (c)(1)(A). This request is being made pursuant to Program Statement 5050.49, Compassionate Release/Reduction in Sentence: Procedures for implementation of Title 18, United States Code 3582 (c)(1)(A).

Inmate Levine was sentenced in the Northern District of Indiana to a Life Sentence, under 3559 SRA Sentencing Procedures, for Conspiracy to Use Interstate Commerce to Effect Murder for Hire, concurrent to Use of Interstate Commerce to Effect Murder for Hire. He was designated to the Federal Bureau of Prisons on October 18, 1991. He arrived at FCI Phoenix on January 4, 2017.

Inmate Levine meets the guidelines stipulated in Program Statement 5050.49, elderly inmates who are over 65 years old and have completed the greater of 10 years or 75% of their term of imprisonment to which they were sentenced. Inmate Levine is currently 76 years old and has completed 26 years, 6 months, and 6 days of the term of imprisonment. If approved for release from federal custody, he has been approved to relocate to the District of Nevada.

This case is not subject to Victim and Witness Protection Act of 1982 (VWP).

**EXHIBIT D**



Washington, DC 20534

MEMORANDUM FOR LESLIE JONES, ACTING WARDEN
FEDERAL CORRECTIONAL INSTITUTION
PHOENIX, ARIZONA

FROM:        Ken Hyle
             Acting Assistant Director/General Counsel

SUBJECT:     LEVINE, Robert
             Federal Register No. 96074-012
             Request for Reduction in Sentence

Please be advised that the request for a reduction in sentence
(RIS) for Robert Levine pursuant to 18 U.S.C. $ 3582(c)(1)(A)(i)
and PS 5050.49, Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g), Section 4(c) ("Other Elderly Inmates") is denied.  We
have carefully reviewed the documentation accompanying this
request and have consulted with the Assistant Director for the
Correctional Programs Division.

Mr. Levine, age 76, has served over 26 years of his life sentence.
However, he orchestrated the murder of his brother and sister-in-
law, and the attempted murder of his nephew.  Based on the serious
nature and circumstances of his offense, and his inability to
accept responsibility for his actions, his early release would
minimize the severity of the offense.  Accordingly, his RIS
request is denied.

Please provide Mr. Levine a copy of this decision.


cc: Mary M. Mitchell, Regional Director, WXRO


**EXHIBIT E**

To:       Warden, FMC Butner
From:     Inmate Robert M. Levine (#96074-012)
Date:     January 28, 2019
Subject:  Request For Reduction in Sentence

Previously, on February 1, 2017, I filed a "Request For Reduction in Sentence at FCI Phoenix. Acting Warden Gutierrez "recommended consideration be given", but General Counsel Ken Hyle denied this request opining, "early release would minimize the severity of the offense". Two months later I discovered a lump in my throat which was later diagnosed as Stage 3 Cancer.

## REQUEST FOR REDUCTION IN SENTENCE

This Request is submitted pursuant to 18 U.S.C. Section 3582(c)(1)(A)(i) as amended by the "First Step Act" and is based upon the "Age of the Defendant" as defined by the United States Sentencing Guidelines Section 1B1.13 as amended on November 1, 2016. Having met those standards, I hereby request that the Director submit a Motion to the United States District Court for the Northern District of Indiana requesting that it, my Sentencing Court, reduce my term of imprisonment.

## AGE OF THE DEFENDANT

I was born prior to the start of World War II on             .

## EXPERIENCING A SERIOUS DETERIORATION
## IN PHYSICAL OR MENTAL HEALTH

In the BOP's Operations Memorandum 002-2015, it identified medical conditions that are permanent, progressive, and ordinarily related to diseases associated with aging that substantially diminish the ability to function in a correctional facility. In addition to now having developed stage 3 non-Hodgkins B-cell Lymphoma, I have "Atherosclerotic cardiovascular disease", "Rheumatologic conditions that have progresses to deformity (e.g. my rheumatoid arthritis in hands and feet), "severe musculoskeletal degeneration", "severe chronic pain that persists despite optimal medical

-1-

**EXHIBIT F**

management", quadruple bypass open heart surgery following two heart attacks, surgical removal of cancerous growth on my parathyroid gland, "severe degenerative disc disorder", impaired vision, hearing and some drooling following palsy on the right side of my face, kidney stones and a cyst on my right kidney. These are most, but not all of my age related physical problems.

Due to these permanent, progressive and deteriorating age related diseases, the Bureau of Prisons is no longer able to provide me with a safe and secure living environment within a Federal Correctional Institution where I am compelled to attempt to interact with almost exclusively younger, violent, more robust and energetic, impatient and clannish individuals. A large percentage of whom were raised in gangs and/or drug related cultures with limited formal education. Many of these men have little tolerance for an old, slow moving, racially, religiously, educationally/socio-economically different individual such as myself.

## HAS SERVED AT LEAST 10 YEARS OF HIS
## TERM OF IMPRISONMENT

I have been continuously incarcerated for 28 years. This is far longer than the actual perpetrator of the crime in my case, who was released in 2013.

## 28 C.F.R. 571.60 – CIRCUMSTANCES THAT COULD NOT HAVE
## REASONABLY BEEN ANTICIPATED BY THE COURT

There are at least two cases that fit this circumstance that arose after the submission of my 28 U.S.C. 2255 motion:

In three places within the 2255 I pointed out that my indictment was both duplicitous and multiplicitous. Not only did it charge me under the general conspiracy statute, but also it charged me with violating four counts of 18 U.S.C. 1958 for travel in interstate commerce with the intent that a murder for hire be committed. I pointed out that there was only one single plot, not five. The sentencing court asserted that I "ignored the notion that all four charged instances of interstate travel collectively caused the deaths ... because they were of the same murder for hire scheme. Levine offers no authority for his strained reading of the statute". 25 F.Supp.2d, 905, 912 (N.D. Ind. 1997). This entire concept was explained by the First Circuit's ruling in United States v Gordon, 875 F.3d 26, 37 (1st Cir 2017).

-2-

which ruled, "... under this statute Congress did not intend to punish separately each use of interstate commerce". Id. Which was effectively what the court had said, but failed to understand that this was the wrong unit of prosecution as it created an unconstitutional double jeopardy/ multiplicity issue. The Gordon Court ruled that defendant's sentence under this circumstance must be vacated.

Another area the court failed to anticipate concerned the lack of jury instructions regarding the intent/mens rea of the killer, McKinney. While raised in three separate areas in the 2255, the court dismissed all three. The first he said was "too terse to warrant further analysis". However, at trial, McKinney under a plea agreement which kept him out of a death sentence and has had him freed from prison : since 2013 swore under oath that on November 9, 1989 when he traveled to Indiana he had left any conspiracy and was gathering evidence to show it to Donald. He swore, "It says - it says, to the (sic) honest with you, I wasn't going to kill anybody. I know it sounds dumb, but ..." (Tr. pg 1604). "But Mark, I just wanted to shut him up. If - I suspect Marsha scared the hell out of me and I shot her and then Donald came out, I shot him, I shot her". (Tr. pg. 1386).

The Supreme Court's retroactive ruling in Burrage v United States, 526 U.S. 204 (2014), was that my burden is to show that it is more likely than not no reasonable juror would have found me guilty beyond a reasonable doubt of causing these deaths. There is no way that this man would have risked his own life to lie on the stand about leaving the "conspiracy" and only taking his actions in the "heat of passion" if it wasn't true. His easier and safer path would have been to go along with the government's story. With a proper "intent" instruction there can be no question that the jury would not have found that I was guilty of Count Five, the main offense in this case, "death results" that "but for" my actions didn't apply as McKinney had been functioning on his own agenda at that time.

### FACTORS AND EVALUATION OF CIRCUMSTANCE IN REQUEST

1. On July 3, 1991 following weeks of trial, I was convicted of "Use of Interstate Commerce to effect a murder-for-hire". I was never charged with death resulting from the crime, but based on the court's opinion of the law at the time and mandatory Sentencing Guidelines, I was given a life sentence based on what the Court ruled was a preponderance of the evidence.

-3-

I am now 78 years old. During my 28 years in prison most of my immediate family has passed away, my Mother, younger brother and most of my aunts and uncles. Even though I was given a sentence of life in prison, I have never become bitter nor acted up. I have always helped other inmates teaching G.E.D. and Adult Continuing Education courses and giving freely of my time to help counsel them much like a big brother or father figure.

While once physically active, my age and continuing medical infirmities have seriously curtailed such endeavors. I now spend more of my time reading or indulging in more sedentary avocations. I do not feel I am feeble, but I have grown frail, with cancer being my most recent problem.

2. Criminal History - I am a first time offender. Other than this offense I have never been found guilty of anything illegal. Not even a moving traffic violation.

3. Comments from Victims - Not Available

4. Unresolved Detainers - None

5. Supervised Release Violations - None

6. Institutional Adjustment - In 28 years of incarceration, I have endeavored to get along well with the many diverse groups of inmates from varied backgrounds.

7. Disciplinary Infractions - In 28 years of incarceration, I have never had an incident report.

8. Personal History - Until my conviction, I was considered an upstanding member of the Phoenix community, serving on the boards of numerous charities and participating in many civic activities. In addition to a bachelor of science degree, I have several other advanced degrees.

9. Length of Sentence and Amount of Time Served — I have served 335 months on a "new law" life sentence.

10. Inmate's Current Age - 78 years

11. Inmate's Age at the time of the Offense/Sentencing
I was 48 years old at the time of the offense.
I was 49 years old when I was Indicted and self Surrendered.
I was 50 years old when I went to trial, was convicted/sentenced.

12. Inmate's Release Plans -

a) I was approved by the Las Vegas. Nevada Probation Department to relocate to Las Vegas, NV upon release from prison. It is my intention to live there with my sister-in-law Toby Stoffa and her husband Thomas

-4-

J. Moore, Esq. in their 3 bedroom, 3½ bathroom home at

, Las Vegas. They have lived in that residence for over
10 years.

b) <u>Anticipated Plans for Self-Support</u> - I am currently approved
for Social Security payments of approximately $2,500 per month. I also
have a sales job offer at a retail store called Antiquities, Inc. which
is located in the Forum Mall in Las Vegas. This is a commission based
position with a monthly draw of $2,500 against sales. The resulting
$60,000/year whould be more than adequate to meet my needs.

c) <u>Method of Paying for Future Medical Treatment</u> - As I am in my
late 70's, I qualify for both Medicare and Medicaid. Further, it is my
intention to secure a supplementary health/drug insurance policy through
either my place of employment or AARP.

13. <u>Minimization of the Offense - Danger to the Community</u> - While
being convicted of being part of a conspiracy to commit a terrible
crime, I was never charged with nor found guilty beyond a reasonable
doubt of the underlying crime being "first degree murder" which even the
actual killer, who was paroled over 5 years ago, testified it was a crime
he committed without criminal intent unrelated to any plot under
sudden provocation. I feel that most people would agree that having
served 28 years - over one third of my life in some of the most dangerous
prisons in the U.S. does not minimize the seriousness of this offense.

As to the seriousness or the danger to any person or the community
posed by my release, at my sentencing, the Court, opined that mine was
a crime of greed not violence. Neither before nor subsequent to this
terrible tragedy have I ever been thought to be a violent person. There
is no one who I would want to harm or whose death or injury would benefit
me in any way.

_____

Robert M. Levine

*Federal Medical Center*
*P. O. Box 1600*
*Butner, NC 27509*

April 24, 2019

REPLY TO
ATTN OF:    E. A. Earwin
            Acting Warden FMC
            FCC Butner

SUBJECT:    Compassionate Release/Reduction in Sentence

TO:         LEVINE, Robert
            Reg. No.: 96074-012
            Quarters: B04-227

Medical staff reviewed your request for a Reduction in Sentence (RIS) to determine whether you met the RIS guidelines in accordance with Program Statement 5050.50. It has been determined that you **do not** meet the criteria under **Elderly with Medical Conditions** at this time.

You have the right to appeal this decision via the Administrative Remedy Process. If you choose to appeal, you do not need to complete the informal review, but you would need to include a copy of this memorandum with your appeal. Any decision regarding appeal will be handled in a manner outlined in policy. Additionally, per policy you have a right to file a request for a reduction in sentence with your sentencing court after receiving a BP-11 response or the lapse of 30 days from the receipt of such a request by the Warden's Office.

We are committed to providing you with the necessary and appropriate care for your medical needs.

cc: AW
Medical Records
Unit Team

**EXHIBIT G**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **Levine Robert M.** **96074-012** **48** **PMC Butner**
 LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

**Part A- INMATE REQUEST** Firstly, I'd like to thank Dr. Carden and his staff for their efforts that helped put my cancer into remission; although I do recognise that there is better than a 30% chance that it will be back within 3 years. However, it was not my malignant B-cell lymphoma on which I based my request for a reduction in sentence.

In the past 4 years medical staff at two FCIs (FCI Phoenix and FCI Victorville I) as well as the BOP central office have not questioned that I "meet the criteria under Elderly with medical conditions". When denied it was always based only on what was believed to be insufficient time served. However, I am now in my 29th year of incarceration, and am over 78 years old, therefore I believe this should no longer be an issue. Further, these prior medical acceptances were based on Operation Memorandum 002-2015 as mentioned in my current request (see attached) which mentioned my multiple heart attacks which ultimately led to quadruple by-pass open heart surgery; "atherosceloric cardiovascular disease"; "severe

5/17/19 (continued on attachment) _____
 DATE | SIGNATURE OF REQUESTER

**Part B- RESPONSE**




_____ _____
 DATE | WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE | CASE NUMBER: **977900-F1**

| CASE NUMBER: **977900-F1**

**Part C- RECEIPT**

Return to: _____
 LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

SUBJECT: _____
 5/17/19
 DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER)

**EXHIBIT H**

BP-229(13)
APRIL 1982

USP LVN

musculoskelatal degeneration"; "severe degenerative disc disorders", etc."
and other age related ailments which were more fully addressed in my Request
but obviously not considered by your unidentified "medical staff" nor does
such staff address "medical criteria to help evaluate the inmate's suitabili
for consideration under the RIS category". (5050.50 4b).

Based on the foregoing and my more complete request, I would appreciate
if you would have appropriate medical staff fully and properly review my
medical records as has been done in the past as required by Operations
Memorandum 002-2015 and by the cardiologist who has not seen me since I have
arrived at FMC Butner.

Thank you for your consideration.


Robert M. Levine

**Admin Remedy Number:** 977900-F1

This is in response to your Request for Administrative Remedy, receipted March 17, 2019, wherein you request to be considered for a Compassionate Release under Elderly with Medical Conditions. Additionally, you request to participate in the Elderly Home Detention Pilot Program under the First Step Act.

A review of your case revealed on April 24, 2019, you were denied a Compassionate Release under Elderly with Medical. Medical Staff reviewed your request for a Reduction in Sentence (RIS) to determine whether you met the RIS guidelines in accordance with Program Statement 5050.50. It has been determined that you do not meet the criteria under Elderly with Medical Conditions at this time.

A review of your case revealed you do not meet the criteria to participate in the Elderly Home Detention Pilot Program under the First Step Act Guidelines. Specifically, you were sentenced to a term of Life imprisonment for a crime of violence, Conspiracy to use Interstate Commerce to Effect Murder for Hire & Use of Interstate Commerce to Effect Murder for Hire.

Unit Team reviewed your case in accordance with established policy and the guidelines outlined in Operations Memorandum Number 001-2019, as they relate to your case. Therefore, your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Mid-Atlantic Regional Office, 302 Sentinel Drive, Suite 200, Annapolis Junction, MD 20701. Your appeal must be received in the Regional Office within 20 calendar days from the date of this response.

E. A. Earwin, Acting Warden

5/24/19
Date

**EXHIBIT I**

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: __Levine, Robert__     __96074-012__     __4B__     __FMC Butner__

    LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A - REASON FOR APPEAL**   On January 21, 2019 I submitted a Request for "Compassionate Release/ Reduction in Sentence" pursuant to 18 USC Section 3582(c)(1)(A)(i) to Ms. Jackson acting Head Social Worker. (attached hereto). On April 24, 2019, Acting Warden E.A. Earwin denied my request based on the fact medical staff "determined that you do not meet the criteria under Elderly with Medical Conditions..." (Exhibit 1). On May 17, 2019 I filed a "Request For Administrative Remedy" (BP-9) addressing only that Medical staff in other institutions had determined that I did meet this criteria even before I had malignant non-Hodgkin B-cell Lymphoma, for which I am currently being treated but am in remission. (see Request For Reduction in Sentence). This was because I was already experiencing "A Serious Deterioration in Physical or Mental Health". My BP-9 only asked for medical staff here at FMC Butner to reconsider my age and all my other medical ailments even though my cancer is not terminal at this time.

     On May 24, 2019 Acting Warden Earwin denied my request for medical staff to reconsider whether or not I met proper RIS criteria. Without additional medical review the warden answered, "it has been determined that you do not...".

     As to unit team's unrequested review, of my case under the "Elderly Home Detention Program", contrary to their opinion, at least three courts have recently concluded that a violation of

__6/6/19__         _Robt M Levine_

     DATE                 SIGNATURE OF REQUESTER

**Part B - RESPONSE**

 

 

_____            _____

     DATE                     REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE           CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C - RECEIPT**

                                   CASE NUMBER: _____

Return to: _____

     LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____               _____

     DATE                 SIGNATURE, RECIPIENT OF REGIONAL APPEAL

18 USC Section 1958 is not a 'crime of violence'". See, Dota v United States, 2018 U.S. Dist LEXIS 223332; United States v Boman, 873 F.3d 1035,1042 (8th Cir 2017); United States v Herr, 2016 WL 6090714 (D. Mass, 10/18/16).

As already addressed in my BP-9 even before I had developed malignant cancer other institutions and the BOP Central Office had already accepted that I met the medical criteria but felt I needed to do some time (Exhibits 2 and 3). I am a 78 year old inmate who for the past three years has required either a wheelchair or a walker. In addition to the Stage III Non-Hodgkins B-cell Lymphoma (which is currently in remission), a disease which requires constant monitoring, evaluation and treatment. It should be noted, that "the majority of relapses occur during the first two years after finishing treatment". WHO. Further, according to the International Prognostic Index, I have a score of 3 indicating not only that I am in the group of which 35% will have died in 3 years, but also who are or will become capable of only limited self-care and are unable to carry out any work activities. Staff at FMC Butner have now placed me on "medically unassigned", corroborating this.

However in addition to the cancer, the already existing conditions that require active monitoring and treatment and which are of at least equivalent danger to my ability to live in prison include atherosclerotic cardiovascular disease which has led to multiple heart attacks and quadruple bypass open heart surgery on 7/24/12. When my extraction refraction level dropped below 30 in October, 2018 24/7 monitoring was suggested, but I opted for modified chemical treatment which is currently working.

While my "permanent, progressive and deteriorating age related diseases are not as life threatening as my cancer or heart disease", "rheumatoid conditions that have progressed to deformity in my hands and feet", "severe degeneration disc disorder, Bell's Paky which has permanently damaged my vision and left me drooling and with impaired hearing. There is a tumor on my right kidney and I develop kidney stones from time to time. I understand that these are signs of my deteriorating physical health. The medical staff at FMC Butner may look at this array of chronic problems as "controlled" or "well-managed" but they all show the need for active monitoring and treatment and demonstrate a substantially diminished ability to provide self-care from which I cannot be expected to recover. Who knows when I will suffer from my next fall or once again have an internal hemmorhoidal blood vein burst causing me to lose 4 pints of blood over one week, both of which happened to me.

The aforementioned extraordinary and compelling reasons establish my substantially diminished and further diminishing ability to provide self-care, a circumstance from which I will never recover.

6/6/19

Robt M. Levine

**REGIONAL ADMINISTRATIVE REMEDY APPEAL**
**PART B — Response**

**Date Filed: June 10, 2019**          **Remedy ID No.: 977900-R1**

You appeal the Warden's response to your request for
administrative remedy. You report that you have been denied a
Reduction in Sentence. You request that the denial be reversed
and to participate in the Elderly Home Detention Pilot Program
under the First Step Act.

A review of your medical records indicates you do not meet the
criteria for a Reduction in Sentence under Elderly with Medical
Conditions as this time. Your medical conditions are currently
managed by your primary care provider team and you are
considered stable. You are also able to function in a
correctional facility. Should your ability change, as outlined
in policy, you can resubmit your request.

Moreover, based on the serious nature of your offense, an early
release would minimize the severity of the offense. You do not
meet the criteria for the Elderly Home Detention Pilot Program
as you were sentenced to a term of Life Imprisonment.

Your appeal is denied.  If you are dissatisfied with this
response, you may appeal to the General Counsel, Federal Bureau
of Prisons, 320 First Street, NW, Washington, DC 20534.  Your
appeal must be received in the General Counsel's Office within
30 days from the date of this response.

JUN 21 2019
_____
Date

_Matthew W. Mellady_
D.J. Harmon
Regional Director
Mid-Atlantic Region

**EXHIBIT K**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: __Levine, Robert M.__      __96074-012__      _____      __FMC Butner__
         LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A—REASON FOR APPEAL** On June 10, 2019 the BOP Mid-Atlantic Regional Office received my Regional Administrative Remedy Appeal (BP-10). It was directed to Regional Counsel's office and a response prepared and dated June 21, 2019. It was not mailed out until July 8, 2019. Once again it incorrectly stated that "a review of your medical records indicated you do not meet the criteria ...". "Cancer", first in the para thyroid (surgically removed) next as malignant non-Hodgkins B-cell Lymphoma (temporarily in remission); multiple "heart attacks" resulting in quadruple by-pass open heart surgery which has seriously curtailed my ability for strenuous exercise; "Severe degenerative disc disease" which causes constant back pain, difficulty walking or even standing for prolonged periods; "Arthritis" in my hands which has twisted my fingers and makes it difficult to even hold a pencil or a bar of soap, and other normal daily tasks, and in my feet causing more walking difficulties; almost 30 years of inadequate dental care which has resulted in improper removal of teeth do meet any reasonable review of the "criteria".

     The "response" went on to claim, "you are currently managed by primary care provider ...". Not true, I'm at FMC Butner and "...are considered stable". I can only assume that means, "not presently TERMINAL". That is not what is required by the law, the Sentencing Guidelines or even any reasonable reading of BOP Policy Statement 5050.50. Medical criteria requires that my diseases "diminish (my) ability to function in a correctional facility".

                    (cont on attachment)

_____                            _____
       DATE                                         SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____                            _____
       DATE                                          GENERAL COUNSEL

**ORIGINAL: RETURN TO INMATE**             CASE NUMBER: _____

**Part C—RECEIPT**

                                          CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____                                    
       DATE                **EXHIBIT L**           SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

Printed on Recycled Paper

BP-231(13)
APRIL 1982

USP LVN

It does not mandate that you have already reached that point of total inability to function. This is further supported by the word "deteriorating". That is the criteria, not whether or not I'm "stable" at some instant in time.

That brings us to the next questionable position taken, "you are also able to function in a correctional facility". What alternative does one have? Lay down in your own excrement and moan until someone moves you to an even worse circumstance? I'm 78 years old but still maintain some self-respect and dignity, at least I try.

As to almost 29 years of continuous incarceration minimizing the severity of the offense consider the fact that the actual killer in this case who testified that his actions were done, not according to any "plot" but in the heat of passion. He was released from prison in 2014. As to the crime and sentence for which I am serving time, proper analysis of the law for which I am now incarcerated shows that I am currently improperly still locked up. See United States v Burrage, 571 U.S. 204 (2014) and United States v Gordon, 475 F.2d 26 (1st Cir. 2017). But why should we be going there? This is a request from an old man with only 4 points, who has never had an incident report who is asking for compassion not a new courtroom challenge.

Exhibit 3

U.S. Department of Justice

Federal Bureau of Prisons

_Washington, DC 20534_

MEMORANDUM FOR LESLIE JONES, ACTING WARDEN
                        FEDERAL CORRECTIONAL INSTITUTION
                        PHOENIX, ARIZONA

FROM:           Ken Hyle
                Acting Assistant Director/General Counsel


SUBJECT:        LEVINE, Robert
                Federal Register No. 96074-012
                Request for Reduction in Sentence


Please be advised that the request for a reduction in sentence
(RIS) for Robert Levine pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)
and PS 5050.49, Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g), Section 4(c) ("Other Elderly Inmates") is denied. We
have carefully reviewed the documentation accompanying this
request and have consulted with the Assistant Director for the
Correctional Programs Division.

Mr. Levine, age 76, has served over 26 years of his life sentence.
However, he orchestrated the murder of his brother and sister-in-
law, and the attempted murder of his nephew. Based on the serious
nature and circumstances of his offense, and his inability to
accept responsibility for his actions, his early release would
minimize the severity of the offense. Accordingly, his RIS
request is denied.

Please provide Mr. Levine a copy of this decision.


cc: Mary M. Mitchell, Regional Director, WXRO


**EXHIBIT M**